United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELANIE LYNN POTTER., | Case No.: 3-14-cv-02562-JSC |
| Plaintiff, | **ORDER RE: PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| CAROLYN COLVIN, COMMISSIONER OF SOCIAL SECURITY | |
| Defendant. | |

Plaintiff Melanie Potter seeks social security disability benefits for a combination of physical and mental impairments, including: affective, anxiety, personality, and somatoform disorders; degenerative disc disease; knee pain; myofascial pain syndrome; headaches; and fibromyalgia.   (AR 172.)  Pursuant to 42 U.S.C. § 405(g), Plaintiff filed this lawsuit for judicial review of the Commissioner of Social Security's final decision denying her benefits claim.  Now before the Court are Plaintiff's and Defendant's Motions for Summary Judgment.  (Dkt. Nos. 16, 17.)  Because the Administrative Law Judge ("ALJ") committed legal error, improperly discounting Plaintiff's testimony and the opinions of her doctors, Plaintiff's motion for summary judgment is GRANTED and the case is REMANDED for an award of benefits under the credit-as-true rule.

United States District Court
Northern District of California

**LEGAL STANDARD**

A claimant is entitled to disability insurance benefits if she can demonstrate that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that can be expected to result in death or last for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1).  The ALJ conducts a five-step sequential inquiry to determine whether a claimant is entitled to benefits.  20 C.F.R. § 416.920.  At the first step, the ALJ considers whether the claimant is currently engaged in substantial gainful activity (*i.e.*, if the plaintiff is currently working); if not, the second step asks if the claimant has a severe impairment or combination of impairments (*i.e.*, an impairment that has a significant effect on the claimant's ability to function); if the claimant has such an impairment, the third step asks if the claimant has a condition which meets or equals the conditions outlined in the Listings of Impairments in Appendix 1 of the Regulations (the "Listings"); if the claimant does not, the fourth step assesses the claimant's residual functional capacity ("RFC") and determines whether the claimant is still capable of performing past relevant work; if the claimant is not capable of performing this work, the fifth and final step asks whether the clamant can perform any other work based on the claimant's RFC, age, education, and work experience.  *Id.*; §§ 404.1520(b), 404.1520(f)(1).

**THE ADMINISTRATIVE RECORD**

Plaintiff was born January 3, 1967.  (AR 75.)  She is a single mother who lives with her mother, brother, and older son.  (AR 150, 57, 379.)  Plaintiff earned a GED in 1985, and worked as a tele-service representative at a call center for Kaiser Permanente from 2000 to 2010.  (AR 42, 746.)  She has not worked since 2010, secondary to her chronic pain.  (AR 746.)

Plaintiff alleges she became disabled in March of 2010.  (AR 22.)  On August 4, 2011, Plaintiff filed for Disability Insurance Benefits (DIB) under Title II.  (AR 74, 149.)  The applications were denied initially, on reconsideration, and after a hearing by an ALJ on January 23, 2013.  (AR 20, 33.)  The Appeals Council denied review, making the ALJ's decision final (AR 1.)  Plaintiff commenced this action for judicial review on June 6, 2014 pursuant to 42 U.S.C. §§ 405(g).  (Dkt. No. 1 at 1-2.)

United States District Court
Northern District of California

# I. MEDICAL EVIDENCE

Plaintiff has seen a variety of physicians and primary care specialists as a result of her medical conditions.  A discussion of the relevant medical evidence follows.

## A.    Medical History, 2008-2010

Plaintiff was a regular patient at the Kaiser Permanente campuses in Napa and Vallejo from 2008 to 2010.  Her primary care physician was Dr. Manuel Ballesca.

From March to June of 2008, Plaintiff attended pain management therapy under the supervision of psychologist Patricia Dwyer.  (AR 328-341.)  Dr. Dwyer diagnosed Plaintiff with a pain disorder associated with physical and psychological factors.  (AR 329.)  Plaintiff also saw Dr. Kevin Hong Cheng Do twice in 2008 for headaches and depression (AR 331-37); he found her positive for myalgias and "clearly depressed."  (AR 336.)  Dr. Do prescribed Plaintiff with pain medications and antidepressants, and filled out disability paperwork that allowed her to take regular time off from work for her headaches.  (AR 331-37.)

Plaintiff had two visits with Dr. Ballesca in 2008.  In June, to cope with her persistent headaches, he recommended she take 30 days off of work.  (AR 260-61.)  In October, he prescribed Plaintiff Celexa for her depression, continued her headache medication, and requested a physical therapy consult for her back pain.  (AR 264-265.)  Plaintiff continued to see Dr. Ballesca in 2009 with new complaints of chronic fatigue and spastic stomach pain.  (AR 269, 441.)  Dr. Ballesca prescribed pain medication for Plaintiff's stomach and signed disability papers allowing Plaintiff to take off work from March 30, 2009 to April 30, 2009.  (AR 269, 454, 457.)  During this period, Plaintiff sent Dr. Ballesca multiple messages indicating severe stress brought on by her symptoms; on March 20, for example, she wrote "I just know I dont feel like myself. . . I cant even clean my house anymore because the Severe Pain makes me stop. . . Im to young to feel this old HELP ME i dont care  if its a dirrerent medication i just want the pain gone, Norco is not doing the job anymore, Morphine not helping all the way yet."  (AR 445, errors in original.)  Plaintiff also complained of chest and arm pain on March 30.  (AR 448.)  Dr. Ballesca signed Plaintiff's disability leave for May 1 through May 15 due to her fatigue, nausea, and stomach discomfort.  (AR 461-463.)

1    Throughout May and June, Plaintiff requested time off from work and complained of fatigue

2  and pain while on the job.  (AR 467-472.)  In June, Dr. Ballesca diagnosed Plaintiff with trochanteric

3  bursitis based on muscle tenderness during an exam of her leg.  (AR 272-73.)  In July, Plaintiff

4  followed up with Dr. Ballesca, reporting additional symptoms of stomach cramps, diarrhea, and

5  constipation.  (AR 485.)  Dr. Ballesca also signed Plaintiff's AB22 paperwork in July, allowing her

6  three days off of work per month to address her headaches and pain.  (AR 495-501.)

7    On July 21, 2009, Plaintiff saw Dr. Sara Ann Skolnick for a gynecological exam.  (AR 275.)

8  Plaintiff reported chronic pain, gastrointestinal issues, and a fifty-pound weight loss over the previous

9  seven months.  (*Id.*)  She also requested a disability work note for the 16th.  (*Id.*)  Dr. Skolnick

10  recommended a change in diet for Plaintiff's digestive issues and did not complete Plaintiff's

11  disability paperwork request.  (AR 275-76.)

12    Plaintiff returned to see Dr. Ballesca through the fall of 2009.  (AR 502-509.)  In September,

13  Dr. Ballesca signed Plaintiff's Verification of Treatment form for visits due to food poisoning and

14  migraines.  (AR 504.)  In November, Plaintiff requested a prescription for Soma instead of Zanoflex;

15  Dr. Ballesca prescribed a trial amount of 30 pills.  (AR 506-07.)  Two months later, Plaintiff notified

16  Dr. Ballesca the Soma prescription was working for her joint pain and requested additional pills.  (AR

17  512.)

18    Plaintiff reached out to Dr. Ballesca again in January 2010 with concerns about a 2" height

19  loss.  (AR 515, 524-525.)  He recommended that she continue taking Vitamin D and over the counter

20  calcium; neck x-rays later showed no height loss in her vertebrae.  (AR 514, 547.)  In messages

21  following that visit, Plaintiff described worsening pain and both physical and personal issues.  (AR

22  529-30.)  In response, Dr. Ballesca set up an appointment with the behavioral medicine department

23  for Plaintiff.  (*Id.*)  Only days later, Plaintiff sent Dr. Ballesca more distressed messages, citing

24  breaking hair and nails and seeking "every test you can think of before [whatever] this is kills me."

25  (AR 533.)  Plaintiff continued to seek treatment and disability paperwork for her pain in late February

26  and early March.  (AR 552, 554-557.)

27    In the spring of 2010, Plaintiff saw a number of other doctors at the Kaiser campus.  In

28  January, she saw Dr. Jeffrey Gao for her chronic pain.  (AR 343.)  He found Plaintiff positive for

United States District Court
Northern District of California

myalgias, neck pain, and joint pain, and documented an abnormal exam of her neck, shoulders and upper back.  (AR 343-44.)  Dr. Gao diagnosed her pain as "diffused myofascial pain syndrome."  (AR 344.)  In March, when Dr. Ballesca was unavailable, Plaintiff saw Dr. George Vellucci with concerns about her neck pain and height loss.  (AR 284, 562-572.)  She requested disability paperwork and muscle relaxants, which Dr. Vellucci did not provide.  (*Id.*)  After reviewing a radiology result that showed disc narrowing on Plaintiff's cervical spine, Dr. Vellucci diagnosed Plaintiff with neck pain and referred her to the spine clinic for further treatment.  (AR 284-85.)  Confusingly, he termed her "drug seeking" while noting that there is "no concern of dependence" given the prescriptions he filled.  (AR 284-85.)  Four days later, Plaintiff returned and saw Dr. Michele Wilson, who found muscular tenderness on Plaintiff's neck, back, and shoulders.  (AR 286-87.)  Dr. Wilson ordered a radiology report of Plaintiff's thoracic spine that indicated minimal spondylosis deformans.  (AR 317, 353, 580-583.)  Plaintiff also saw Dr. Qui in March for lower back pain radiating through her legs.  (AR 289, 584-585.)  Dr. Qui diagnosed Plaintiff with chronic pain and sciatica, and gave Plaintiff backdated leave from work for February 23 through March 7.  (AR 289-90.)  Dr. Qui ordered a radiology report on Plaintiff's spine, which found "minimal disk space narrowing" and "minimal facet joint space narrowing" at the L4-L5 and L5-S1 levels.  (AR 316.)  Both suggest degenerative disc disease.  (*Id.*)

Plaintiff lost her job in March of 2010.  (AR 42.)  As evidenced below, her subsequent loss of insurance permeated many of her medical visits afterward and eventually led her to change medical care providers.

Plaintiff followed up on her back pain with Dr. Ballesca on March 26, 2010.  (AR 291, 590-591.)  He noted muscle tenderness, pain, and a limited range of motion in Plaintiff's back, but also expressed concerns about the addictive potential in Soma.  (*Id.*)  Plaintiff said "she would rather have [the medication] than . . . go through constant pain."  (*Id.*)  The next day, Plaintiff asked for a longer-term disability extension because her insurance was ending on March 31, 2010, and she was unsure how long it would take her to get coverage through Medi-Cal afterwards.  (AR 594.)  Plaintiff reiterated this concern on March 29, and Dr. Ballesca responded by giving her a 90-day extension.  (AR 595-96.)  Similarly, Plaintiff requested on March 30 and April  21 that Dr. Ballesca refill her

1  prescriptions before she lost insurance coverage, but he declined to fill her prescriptions early on both

2  occasions.  (AR 605-611.)

3       Plaintiff was referred to Dr. Peter Boorstein at the end of March for her neck pain.  (AR 346.)

4  Dr. Boorstein documented Plaintiff's morbid obesity and "extremely poor posture," noting that

5  Plaintiff's "neck displaces her head forward [by] almost 4 inches."  (*Id.*)  He also found tenderness in

6  Plaintiff's thoracic muscles, degenerative dessication, and mild disc bulges in her spine.  (*Id.*)

7  However, Dr. Boorstein said Plaintiff's shoulder and T spine exams were normal.  (*Id.*)  He thus

8  advised Plaintiff to "work massively" on her posture, possibly with a brace, and to use this posture

9  correction along with stretching and "simple medications" to reduce pain at her job.  (*Id.*)  Dr.

10 Boorstein suggested that Plaintiff may need to change her career to get a job with a "low physical

11 demand" and "less sitting at a keyboard."  (*Id.*)  Dr. Boorstein did not address any of Plaintiff's

12 psychiatric issues, and refused to fill Plaintiff's prescriptions.  (*Id.*)

13      On April 22, Plaintiff requested another medication refill from Dr. Ballesca because she was

14 taking extra morphine for her neck pain.  (AR 614-15.)  That same day, Plaintiff visited the

15 emergency room at Queen of the Valley Medical Center with a severe headache.  (AR 707-08.)  She

16 reported being out of medication, recently off Kaiser insurance, and without a "local physician" to

17 refill her prescriptions.  (AR 707.)  The next day, Dr. Ballesca filled her prescriptions and contacted

18 the pain clinic to make adjustments to her medication regimen.  (AR 619.)

19      Plaintiff reached out to Dr. Ballesca again in June of 2010.  (AR 294, 630, 635.)  She

20 requested a mental health referral—although her depression was stable, she was concerned about the

21 effect of losing her health insurance on her mental health treatment.  (AR 294, 636.)  Plaintiff

22 continued to seek medication refills and disability paperwork from Dr. Ballesca through July, August,

23 and September of 2010.  (AR 642-662.)  Dr. Ballesca complied with the majority of Plaintiff's

24 requests, but would not fill Plaintiff's prescriptions early.  (*Id.*)  Throughout this period, Plaintiff also

25 described worsening pain and weakness.  (AR 657, 660.)

26      In October, Plaintiff contacted Dr. Ballesca with two requests: first, she asked for records of

27 her chronic pain and disability; second, she requested higher dosages of narcotics for her pain.  (AR

28 671.)  Dr. Ballesca declined to change her medications.  (AR 670, 672.)  He was "not comfortable

United States District Court
Northern District of California

6

giving high doses of narcotics," nor was he aware of anyone on his team who would prescribe pain medications at the level Plaintiff requested. (AR 670.) Plaintiff responded a few days later describing worsening symptoms—"extreme severity, now pain in muscles, bones, face, the nerve pinches have me jumping out of my skin." (AR 674.) Dr. Ballesca refilled her medications the next day. (AR 677.)

Plaintiff saw Dr. Ballesca again in November 2010 for a neck pain check-up and mild dermatitis. (AR 683-84.) A week later, she again requested early pain medication refills—with specific concerns about cost sharing now that she was on Medi-Cal instead of her private insurance. (AR 686-67.) On November 18, however, Plaintiff sent Dr. Ballesca a message to thank him for not refilling her morphine prescription and giving her "a chance to detox." (AR 691.) She reported feeling better and "less sedate." (*Id.*) Plaintiff also indicated she was ready for alternate pain management therapies and advised Dr. Ballesca she would be requesting medical records for her social security disability application. (*Id.*)

Plaintiff had two emergency room visits in late 2010. On November 15th, Plaintiff visited Dr. Rodney Look at St. Helena Hospital seeking a medication refill because she lost her Kaiser insurance coverage. (AR 389.) Noting her chronic pain history and previous prescriptions, Dr. Look provided Plaintiff with 20 Norco tablets and referred her to doctors at Clinic Ole for pain treatment and a myofascial pain evaluation. (AR 389.) Plaintiff returned to the same emergency room two weeks later seeking additional pain medication until she could resolve issues with her insurance coverage. (AR 385.)

### B.   Medical History, 2011-2012

Following the loss of her private insurance coverage after her March 2010 firing, Plaintiff received medical care at Queen of the Valley Medical Center, the Napa Pain Institute, and Clinic Ole Community Health Clinic ("Clinic Ole"). Below is a summary of her visits.

Plaintiff visited the emergency room at Queen of the Valley Medical Center on January 12, 2011 with symptoms of narcotic withdrawal. (AR 710-12.) That afternoon, Plaintiff saw Dr. Grigsby from the Napa Pain Institute. (AR 713.) He ordered an MRI that showed degenerative changes and

minimal central canal narrowing at Plaintiff's L3-4 and L4-5, a small annular fissure at L4-5, and desiccation and disc protrusion at L5-S1.  (*Id.*)

Plaintiff frequented the Napa Pain Institute from January 2011 through July 2011 for her headaches and her neck, shoulder, and back pain.  (AR 396-416.)  While the record is not clear who examined her with each visit, she was generally under the care of Dr. Gregory Pope.  (AR 413-416.)  Throughout her visits, Plaintiff was diagnosed with neck and shoulder pain, myofascial pain syndrome, migraines, anxiety, depression, headaches, "n/o drug abuse,"[1] fibromyalgia, lumbar DDD[2], a disc tear at LF-5, lumbar spondylosis, ligamentum flavum hypertrophy, lumbar facet arthropathy, and trochanteric bursa.  (AR 396-416.)

Plaintiff was given x-rays and MRIs to support the diagnoses at the Napa Pain Institute.  (*Id.*)  Her MRI demonstrated L3-4 and L4-5 "hypertrophic changes in the facet joints," thickening at the "L4-5 level" and other issues that "could be contributing to back pain and radicular pain."  (AR 416.)  Plaintiff was prescribed numerous treatments and medications for her chronic pain, including Norco, Zanaflex, Topamax, Naproxen, Xanax, Toradol shots, Lidocaine patches, Flexeril, morphine, and other illegible medications.  (*Id.*)

Plaintiff was also treated at Clinic Ole between November 2010 and August 2011.  (AR 721-736.)  Nurse practitioner Ramiro Zapate diagnosed her with chronic pain syndrome, fibromyalgia, an anxiety disorder, hyperlipidemia, GERD, migraines, depression, and drug dependence.  (*Id.*)  He also noted Plaintiff's multiple "[p]sychosocial issues, including financial issues [and] limited health insurance coverage."  (AR 727-28.)  In August, nurse practitioner Lucretia Sonderer saw Plaintiff, prescribing her medications for anxiety, pain, and asthma.  (AR 721-22.)  At follow-ups in August and September, Plaintiff complained of severe knee, thigh, and lumbar back pain; her headaches, on the other hand, improved.  (AR 794-799.)  A radiology report of Plaintiff's knee taken on August 4, 2011 showed no abnormalities.  (AR 800.)

On September 26, 2011, Plaintiff threatened Dr. Pope with a malpractice lawsuit because he declined to file an extension of her disability for her back and knee pain when he primarily treated her

---

[1] N/O drug abuse presumably refers to narcotic/opioid drug abuse.
[2] DDD presumably refers to degenerative disc disease.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    neck pain and headaches.  (AR 791.)  Consequently, Dr. Pope terminated his doctor/patient

2    relationship with Plaintiff.  (*Id.*, AR 788.)  Two days later, Plaintiff followed up with Ms. Sonderer at

3    Clinic Ole about her medications.  (AR 859.)  Ms. Sonderer treated Plaintiff for her anxiety by

4    continuing her Klonopin regimen.  (AR 859.)  She referred Plaintiff to Dr. Eric Grigsby for chronic

5    pain treatment and noted Plaintiff's distress about the end of her relationship with Dr. Pope.  (*Id.*)

6        In October, Plaintiff saw licensed clinical social worker Alicia Hardy about her depression

7    and anxiety.  (AR 857.)  During their consultation, Plaintiff was upset that "no one believe[d]" her

8    about her severe pain and was frustrated in her medical care, "living situation[,] and social isolation."

9    (*Id.*)  She reported sleeping for sixteen hours a day and described her fight with Dr. Pope.  (*Id.*)  Ms.

10   Hardy counseled Plaintiff to "increase social contact" to help with her depression.  (*Id.*)  Plaintiff told

11   her she was reducing her Klonopin dosage, and Ms. Hardy did not prescribe any new medications.

12   (*Id.*)

13       Plaintiff followed up with Ms. Sonderer in October about her chronic pain.  (AR 855.)  Ms.

14   Sonderer noted in her exam that Plaintiff's "entire low back and posterior thighs" were

15   "excruciatingly tender to light touch."  (AR 856.)  Plaintiff continued with monthly check-ins about

16   her pain and mental health issues at Clinic Ole for the next six months, regularly citing extreme pain.

17   (AR 835-852.)  Notably, Plaintiff mentioned that she missed the pain management program at Kaiser

18   (AR 839) and that she sometimes needed to borrow money to pay for pain medications (AR 845.)

19       In June of 2012, Plaintiff visited the ER at Queen of the Valley Medical Center for chronic

20   pain and morphine withdrawal.  (AR 876-77.)  Doctors noted a slipped disc in her neck, pinched

21   nerves, bone spurs, and withdrawal symptoms; she was then dismissed and advised to follow up with

22   a primary health care physician.  (AR 878-82.)  Plaintiff began physical therapy at Queen of the

23   Valley Medical Center in July of 2012, but missed a number of appointments.  (AR 869-71.)  In

24   September, Plaintiff reported feeling worse, but her physical therapist said she made improvements in

25   strength and lumbar movement.  (AR 873-74.)  He said she had not yet met her goal of being able to

26   complete light housework, stand, or walk without increasing pain.  (AR 874.)

27

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## C.    Medical Evaluations

In addition to routine and emergency medical visits, Plaintiff underwent several examinations to determine her functional capacity in support of her application for disability benefits.  Below is a summary of these evaluations.

### 1.  *Examining Psychologist Janet Cain*

Psychologist Janet Cain performed a psychological evaluation of Plaintiff at the request of the Agency on September 28, 2010.  (AR 379.)  In addition to talking about her social history, Plaintiff told Dr. Cain that she began experiencing back, neck, and arm pain in 2007.  (*Id.*)  After trying physical therapy, the pain returned in 2009.  (*Id.*)  Plaintiff told Dr. Cain that she had been getting severe headaches for years, which her employer used to accommodate by allowing her to take off three days per month.  (*Id.*)  Plaintiff also shared that Child Protective Services took away her younger son because she was on too many pain medications to care for him.  (*Id.*)  Plaintiff admitted prior alcohol abuse in the late 1990s, but denied any current alcohol or street drug use.  (*Id.*)  She and Dr. Cain also discussed her long history with depression.  (*Id.*)  Dr. Cain diagnosed Plaintiff with depression, an anxiety disorder, and a personality disorder.  (AR 381.)  According to Dr. Cain, Plaintiff was oriented and her judgment was intact, but her independent living skills and social function were moderately impaired.  (AR 380-81.)  Dr. Cain thus cautioned that while Plaintiff's "intellect [was] sufficiently intact to understand, carry out, and remember simple instructions" and she was "able to respond appropriately to changes in the routine work setting as well as safety concerns," Plaintiff "[would] have difficulty responding appropriately to coworkers, supervisors, and the general public secondary to her depression and reported anxiety."  (AR 380.)

Dr. Cain performed a second psychological examination of Plaintiff for the Agency a year later.  (AR 746.)  After reviewing Plaintiff's medical and social history with her, Dr. Cain determined that Plaintiff presented "significant personality disorder, depression, and anxiety."  (AR 747.)  Dr. Cain opined that Plaintiff was moderately impaired in her daily living skills—Plaintiff slept most of the day, rarely showered, had her son cook for her, and did not routinely shop, manage money, or drive to places besides appointments.  (*Id.*)  Dr. Cain also found Plaintiff's social functioning, or her ability to relate to others, was moderately to significantly impaired.  (*Id.*)  Consequently, Dr. Cain

advised that Plaintiff would have difficulty interacting with co-workers, supervisors, and the general public. (AR 748.) In addition, she noted that Plaintiff would probably face difficulty with attendance because of her pain. (*Id.*)

### 2. *Examining Physician Dr. Navjeet Boparai*

Dr. Navjeet Boparai performed a comprehensive orthopedic evaluation of Plaintiff at the request of the Agency in September 2011. (AR 739-743.) Plaintiff's primary complaint was pain in her low back and knee. (AR 739.) She told Dr. Boparai her pain was intermittent, ranging anywhere from 0 out of 10 to 10 out of 10, was worsened by all physical activity, and presented as burning, stabbing, or aching. (*Id.*) Plaintiff reported being independent in her daily activities, spending "her day watching T.V. and going for walks." (AR 740.) Regarding house work, Plaintiff said she did not perform yard work and cleaned only her room in the house. (*Id.*) In his examination of Plaintiff, Dr. Boparai found that she had difficulty removing her socks, hip and joint tenderness, an antalgic gait (meaning that Plaintiff had developed an unusual gait to avoid pain), was unable to hop or squat, and suffered severe pain. (AR 740-42.) He diagnosed her with obesity, bilateral knee pain, axial low back pain, and reported fibromyalgia. (AR 472.) Regarding Plaintiff's functional capacity, Dr. Boparai found that Plaintiff was capable of standing or walking up to four hours a day, sitting up to six hours, lifting or carrying items up to ten pounds frequently, and lifting or carrying items between ten and twenty pounds occasionally. (AR 743.) He further opined that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, or crawl, but could not work around heavy machinery due to her opiate medications. (*Id.*) Dr. Boparai found Plaintiff had no manipulative activity limitations or limitations for working in temperature, chemical, dust, fume, gas, or noise extremes. (*Id.*)

### 3. *Nonexamining Psychologist Dr. Norman Zukowsky*

About two weeks later, Dr. Norman Zukowsky performed a mental residual functional capacity assessment of Plaintiff for the Agency. (AR 749-751.) The sparse check-the-box report concluded that Plaintiff was capable of understanding and remembering one to two step instructions, carrying out rote routines of one to two steps, accepting supervision and working in coordination with supervisors and coworkers but not the general public, travelling independently, making decisions, avoiding common hazards, and coping with ordinary workplace stressors. (AR 751.) In a separate

United States District Court
Northern District of California

1    evaluation form, Dr. Zukowsky diagnosed Plaintiff with affective and anxiety related disorders, and

2    depression.  (AR 752-55.)  He found Plaintiff mildly limited in her daily living, and moderately

3    limited in her social function and concentration.  (AR 760.)  Dr. Zukowsky did not elaborate on any

4    of his conclusions.  (AR 749-60.)

5    ### 4.    *Examining Physician Dr. B. Williams*

6         Dr. B. Williams completed a physical residual functional capacity assessment of Plaintiff on

7    November 8, 2011 at the request of the Agency.  (AR 763.)  In his analysis of Plaintiff, Dr. Williams

8    emphasized the following details: pain and mild muscle tenderness in her neck, a workers'

9    compensation denial, her self-reported height loss, and her requests for disability and Soma.  (AR

10   768.)  Dr. Williams reported her height and weight as 5'4" and 219 pounds and her mood depressed,

11   anxious, agitated, and uncooperative.  (*Id.*)  Dr. Williams found Plaintiff exertionally limited in the

12   following ways:  she could occasionally lift and/or carry twenty pounds, frequently lift and/or carry

13   ten pounds, stand at least 2 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday,

14   and push or pull within the limits of her lifting and carrying limitations.  (AR 764.)  Dr. Williams

15   clarified that Plaintiff could likely stand up to 4 hours in a day, secondary to her "antalgic gait" and

16   "pain with walking."  (*Id.*)  While Dr. Williams found no limitations in Plaintiff's manipulative,

17   communicative, or visual abilities, he did note that she should only occasionally climb, balance,

18   stoop, kneel, crouch, or crawl because of her knee pain.  (AR 765-66.)  Dr. Williams also opined that

19   Plaintiff should avoid even moderate exposure to hazards such as machinery or heights.  (AR 766.)

20   After summarizing her medical records, Dr. Williams found no internal inconsistencies and

21   concluded that Plaintiff was partially credible; the severity of her injuries was not fully supported by

22   his objective findings.  (AR 769.)  In a consulting note, Dr. Zukowsky agreed with Dr. Williams's

23   analysis while specifying that Borderline Personality Disorder was not a full diagnosis and therefore

24   could not be considered for Social Security purposes.  (AR 770.)

25

26

27

28

United States District Court
Northern District of California

### 5.    *Treating Physician Dr. Townsend*

On November 28, 2012, Dr. Colleen Townsend,[3] one of Plaintiff's treating physicians from Clinic Ole, completed a "Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment." (AR 939-943.)  She made the following determinations: Plaintiff had no limitations as to interacting appropriately with the general public, asking simple questions or requesting assistance, or maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; Plaintiff was mildly limited with the ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, to carry out short and simple instructions, to sustain an ordinary routine without special supervision, and to respond appropriately to changes in the work setting; Plaintiff was moderately limited in the ability to carry out detailed instructions, work in coordination with or proximity to others without being unduly distracted by them, make simple work-related decisions, and get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; Plaintiff had moderately severe limitations in the ability to understand and remember detailed instructions, to accept instructions and to respond appropriately to criticism from supervisors, and to set realistic goals or to make plans independently of others; and finally, Plaintiff had severe limitations with the ability to maintain concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and to travel in unfamiliar places or use public transportation. (AR 940-941.)

Based on the above assessment, Dr. Townsend opined that Plaintiff had suffered a substantial loss of ability to respond appropriately to supervision, co-workers, and usual work situations or to deal with changes in a routine work setting. (AR 942.)  She dated the onset of Plaintiff's symptoms as 2006, and noted that they either had lasted or could be expected to last 12 continuous months at the same severity. (*Id.*)  Ms. Hardy, one of Plaintiff's treating social workers, provided additional

_____

[3] The form was signed by both Dr. Townsend and social worker Alicia Hardy. (AR 943.)  However, as explained below, for the purposes of this review, Dr. Townsend completed the evaluation.

comments noting that she had seen Plaintiff on six occasions following a referral from Plaintiff's primary care physician; Plaintiff was "significantly impaired by her depression, anxiety, [and] chronic pain" throughout her treatment.  (AR 943.)  She emphasized Plaintiff's depression and anxiety diagnoses, as well as childhood trauma, social isolation, and her previous abusive marriage. (*Id.*)  According to Ms. Hardy, Plaintiff's mental health issues caused her to sleep most of the day, rendered her unable to care for her minor son, created difficulties with attendance at her job, and impaired her "follow through" with daily living activities.  (*Id.*)

### 6.     *Treating Physician Dr. Doug Wilson*

In December 2012, Dr. Doug Wilson[4] completed a similar evaluation of Plaintiff's physical limitations.  (AR 932-37.)  He stated that Plaintiff was not capable of performing "sustained sedentary work on a regular and continuing basis, *i.e.*, 8 hours a day, 5 days a week." (AR 932, emphasis omitted), nor was she capable of performing light work.  (AR 933.)  Plaintiff could sit or stand for one hour, or walk for two hours, before needing to rest or change positions.  (*Id.*)  In an eight-hour workday, Plaintiff could sit for four hours, stand for two hours, and walk for three hours; she needed to lie for four hours.[5]  (AR 934.)  Plaintiff could lift or carry five pounds continually and regularly for one hour at a time.  (*Id.*)  Plaintiff could reach or handle objects for 30 minutes a day; finger objects for 45 minutes; and feel objects for 90 minutes a day.  (AR 935.)  He also found Plaintiff could stoop, kneel, or crouch for 30 minutes each per eight-hour workday.  (AR 936.) Finally, he noted Plaintiff had limited mobility due pinched nerves in her neck.  (*Id.*)

## II. ALJ HEARING TESTIMONY

On December 19, 2012, Plaintiff appeared at her hearing before Administrative Law Judge Maxine R. Benmour ("the ALJ").  (AR 40.)  Both Plaintiff and Vocational Expert Kathryn McAlpine ("the VE") testified.  (*Id.*)

---

[4] As with Dr. Townsend and Ms. Hardy, both Dr. Wilson and nurse practitioner Sonderer completed this form.  (AR 937.)  For the purposes of this review, however, Dr. Wilson completed the evaluation.
[5] The discrepancy here—that these activities add up to 13 hours instead of 8 hours—will be addressed below.

### A.      Plaintiff's Testimony

Plaintiff began experiencing neck pain in 2007.  (AR 43.)  She secured workers' compensation as a consequence of the pain in 2007, and again when it returned in 2009.  (AR 43-44.) When a third worker's compensation claim was denied, Dr. Ballesca placed Plaintiff on disability. (AR 44.)

Plaintiff's neck pain has gotten "progressively worse" since 2009.  (*Id.*)  It feels like a "lightning bolt," lasting from a few minutes to aching all day.  (*Id.*)  It is triggered by any number of basic movements, *e.g.*, reaching to clean herself in the shower.  (AR 43.)  Plaintiff also suffers significant pain in her left shoulder and lower back.  (AR 46-47.)  A couple of times each month, Plaintiff's back seizes from the pain, making it difficult for her to get out of bed and move around. (AR 47-48.)  Finally, since mid-2010, Plaintiff has had an aching pain in her knee that impairs her ability to walk, sit, and stand.  (AR 48.)

To dull the pain, which is typically around a seven or eight on a scale out of ten, Plaintiff takes 45 milligrams of morphine three times daily and 10 milligrams of Norco twice daily.  (AR 45, 48.)  After taking her medication, Plaintiff's pain is reduced to about a four or five out of ten, but her concentration is impaired and she feels dizzy and drowsy.  (AR 45-46, 48.)  Even with medication, however, Plaintiff is "constantly in pain;" she merely experiences "different variations" of it that are aggravated by daily activities.  (AR 49.)

Plaintiff has additional physical medical conditions, including fibromyalgia (AR 49-50), eczema (AR 50), headaches (AR 56), and severe fatigue.  (AR 50.)  Because of her pain and fatigue, Plaintiff spends most of the day lying down.  (AR 48, 51, 59, 62.)  She usually wakes up between 11:00 am and 1:00 pm, and proceeds to stay in bed and watch television, with an occasional cigarette break.  (AR 59.)  She can sit for about one hour, walk for about half a block, and/or stand for about twenty minutes before the pain overwhelms her and she needs to lie down.  (AR 51.)  Due to her pain, Plaintiff only takes one to two showers per week.  (AR 57.)  While she is capable of dressing herself, doing her hair, and putting on makeup, she will only do those things if leaving the house for a doctor's appointment.  (AR 57.)  Plaintiff can only use a computer for about half an hour before it aggravates her shoulder and back pain.  (AR 62-63.)

Plaintiff suffers from depression and anxiety.  (AR 54.)  At the time of her hearing, she took 50 milligrams of Celexa daily to treat both, which treated some of her depression symptoms but did little to dampen her anxiety.  (AR 54.)  Plaintiff's depression and anxiety have been ongoing since at least 2008, and were aggravated during her former verbally abusive marriage.  (AR 55.)

Plaintiff sees Lucretia Sonderer at Clinic Ole for her medical treatments.  (AR 50.)  Ms. Sonderer recommends Plaintiff only lift about five pounds to avoid aggravating her nerve pain.  (AR 51-52.)  Other doctors have recommended physical therapy, which Plaintiff neither has the energy for, nor does she believe it effectively reduces her pain.  (AR 52.)  Plaintiff's knee pain has been temporarily relieved by injections, but she has not received injections for her back or neck pain.  (AR 52.)

Plaintiff got into an argument with Dr. Pope at Napa Pain Institute; while Dr. Pope claims it was about whether he would complete her disability paperwork, Plaintiff states she was upset that he failed to treat her for her leg pain with additional injections.  (AR 53-54.)  Plaintiff also disagreed with Mr. Zapate, her initial treating source at Clinic Ole, because he wanted to take her off of her anxiety medications.  (AR 54.)

At the time of her hearing, Plaintiff lived with her mother, brother, and older son.  (AR 57.)  Child Protective Services took her younger son in October 2010 because Plaintiff was too disabled to care for him and ensure he attended school.  (AR 58.)

To pay her rent, Plaintiff does light housekeeping in a small area, such as cleaning the toilet or cleaning her own dishes.  (AR 58.)  She does her own laundry.  (AR 59.)  Plaintiff occasionally feeds herself with prepared foods such as yogurt or cereal, but her older son does the majority of the cooking and all of the grocery shopping.  (AR 58-59.)  Plaintiff used to be more social, attending plays, movies, and bars.  (AR 64.)  Now, she rarely goes out or sees friends.  (AR 65.)

At her previous job, Plaintiff was eligible for disability accommodations.  (AR 59-60.)  To help with her headaches and body pain, she worked in a building with dim lighting at a sit/stand desk and was allowed three to four days off per month.  (AR 60-61.)  In her last months at the job, Plaintiff was only able to work for four days a week, took all of her disability days, switched shifts with co-workers to get fewer hours, and took additional sick days.  (AR 60-61.)  Although they initially

1   praised her as an excellent employee, Plaintiff's employers began to complain about her attendance

2   and her ability to deal with callers as her pain progressed.  (AR 61-62.)  She does not believe she

3   could return to her job as a call center representative because of her physical pain, anxiety, and

4   depression.  (AR 65-66.)

5          **B.     The VE's Testimony**

6          The ALJ presented the VE with a hypothetical of an individual of Plaintiff's age, education,

7   and work history who could perform unskilled work; lift and carry ten pounds occasionally, and less

8   than ten pounds frequently; sit for six hours in an eight hour day; stand and walk for two hours in an

9   eight hour day; occasionally balance, stoop, kneel, crouch, crawl, or climb ramps and stairs; but could

10  not walk on uneven terrain or work near exposure to extreme cold, vibration, and hazards; and could

11  have only occasional contact with supervisors, co-workers, and the public.  (AR 29.)  The VE

12  testified that such an individual could not perform Plaintiff's past work as a tele-service

13  representative.  (AR 69.)  Instead, he or she could perform "production, sedentary, unskilled work"

14  (DOT 725.684-018, of which 578 jobs exist in California) or work as an electronic assembler (DOT

15  726.687-030, of which 122 jobs exist in California).  (AR 69.)

16         The ALJ then modified the hypothetical, asking what work an individual could perform if, in

17  addition to the restrictions listed above, the person had to lie down for four hours out of a work day.

18  (AR 69.)  The VE testified that such an individual could not perform any jobs.  (AR 69.)

19         Plaintiff's attorney also examined the VE.  (AR 70.)  He asked whether this hypothetical

20  individual could perform the recommended jobs if he or she needed to stand for ten minutes for every

21  half an hour he or she sat, to which the VE responded no.  (AR 72.)  He then asked whether this

22  hypothetical individual could perform this work if he or she needed to miss three days of work per

23  month due to her impairments.  (AR 72.)  The VE said that while such an individual could likely get

24  one of these jobs, he or she would be unable to maintain it.  (AR 72.)

25  **III.  ALJ'S OPINION**

26         On January 23, 2013, the ALJ performed the five-step disability analysis and found Plaintiff

27  not disabled under Sections 216(i) and 223(d) of the Social Security Act.  (AR 17-33.)  At the first

28  step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 1, 2010,

United States District Court
Northern District of California

Plaintiff's alleged disability onset date.  (AR 22.)  At the second step, the ALJ found that Plaintiff had the following severe impairments: an affective disorder, obesity, a personality disorder, a somatoform disorder, degenerative disc disease of the cervical spine and the lumbar spine, myofascial pain syndrome, headaches, an anxiety disorder, and fibromyalgia.  (AR 22.)

At the third step, the ALJ found that Plaintiff did not have impairments or a combination of impairments that met the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 23.)  The ALJ considered both Plaintiff's physical and mental impairments.  (AR 23-24.)  The ALJ found Plaintiff mildly limited in daily living activities, citing her independence with cooking, cleaning, hygiene, and travel even though Plaintiff could not care for her son and had difficulty showering and getting dressed.  (AR 24.)  The ALJ found that Plaintiff was moderately restricted in social functioning and had moderate difficulties with concentration, persistence, or pace.  (AR 24-25.)  She found no evidence of extended decompensation in Plaintiff.  (AR 25.)

At the fourth step, the ALJ concluded that Plaintiff had the residual functional capacity to perform sedentary unskilled work with occasional contact with supervisors, co-workers, and the public, with the following limitations: lifting or carrying ten pounds frequently; sitting for six hours in an eight hour work day; standing or walking for two hours in an eight hour work day; no walking on uneven terrain or climbing ladders, ropes, or scaffolding; occasional balancing, stooping, kneeling, crouching, crawling, or climbing of ramps and stairs; avoiding concentrated exposure to extreme cold and vibration; and avoiding exposure to hazards.  (AR 26.)  While the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, her testimony about the "intensity, persistence, and limiting effects" of her symptoms was not entirely credible.  (AR 27.)

Regarding Plaintiff's physical impairments, the ALJ found that the objective medical record did not support Plaintiff's disability claims because "[o]bjective diagnostic imaging of the spine has been consistently mild with minimal abnormal findings" and "[k]nee imaging was normal."  (AR 27.) She gave great weight to Dr. Boorstein's assessment, generally adopting his opinion.  (AR 28.)  She gave partial weight to Dr. Boparai's assessment and the assessments of State medical consultants, but found that Plaintiff had additional restrictions due to her self-reported limitations and pain.  (AR 28-

United States District Court
Northern District of California

29.)  The ALJ gave little weight to Dr. Wilson's opinion, because it was "internally inconsistent," inconsistent with the record as a whole, and included "significant manipulative limitations for which there is [sic] no evident impairments."  (AR 29.)  The ALJ also discussed treatment and opinions provided by Drs. Ballesca, Pope, and Skolnick, but failed to address how much weight she gave them in determining Plaintiff's RFC.  (AR 27-28.)

As for Plaintiff's psychiatric impairments, the ALJ gave great weight to Dr. Cain's assessments given their general consistency with the record and her objective findings.  (AR 29-30.) She gave partial weight to Dr. Townsend's opinion because it accepted Plaintiff's subjective reports uncritically, and was inconsistent with the record as a whole.  (AR 30-31.)  The ALJ also discussed opinions from State psychological consultants, but did not describe how much weight she gave them. (AR 30.)

Regarding Plaintiff's own testimony, the ALJ found that "[t]he objective record does not support [Plaintiff's] allegation that she must stay in bed most of the day, nor . . . her allegations of extreme debilitating pain."  (AR 31.)  The ALJ was not persuaded by Plaintiff's description of her medication's side effects, either.  (*Id.*)  The ALJ concluded that Plaintiff was "exceptionally focused on obtaining disability benefits since 2008," her allegations were generally "exaggerated," and she displayed "drug-seeking behavior."  (*Id.*)

At step five, the ALJ found that Plaintiff could not perform past relevant work, but found that she could perform other work in the national economy.  (AR 32.)  Although Plaintiff's limitations partially eroded the unskilled sedentary occupational base, the ALJ concluded she could work as an assembly production worker or an electronic assembler.  (AR 33.)  Taken together, about 700 of these jobs exist in California.  (AR 33.)  Thus, the ALJ held that Plaintiff was not disabled under the Social Security Act.  (AR 33.)

**STANDARD OF REVIEW**

The Court's jurisdiction is limited to determining whether the Social Security Administration's denial of benefits is supported by substantial evidence in the administrative record. 42 U.S.C. § 405(g).  A district court may overturn a decision to deny benefits only if it is not supported by substantial evidence or if the decision is based on legal error.  *Andrews v. Shalala*, 53

United States District Court
Northern District of California

1    F.3d 1035, 1039 (9th Cir. 1995); *Magallenes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

2    Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant

3    evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrew*, 53 F.3d at

4    1039.   In reviewing a Commissioner's decision to deny disability benefits, the Court must consider

5    the record as a whole, weighing both the evidence that supports and the evidence that detracts from

6    the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of

7    supporting evidence.  42 U.S.C. § 405(g); *Garrison v. Colvin*, No. 12-15103, 2014 WL 3397218 at

8    *11 (9th Cir. July 14, 2014).  Determinations of credibility, resolution of conflicts in medical

9    testimony, and all other ambiguities are to be resolved by the ALJ.  *Magallanes*, 881 F.2d at 750.

10   The decision of the ALJ will be upheld if the evidence is "susceptible to more than one rational

11   interpretation." *Andrews*, 53 F.3d at 1040.

## DISCUSSION

13       The ALJ's determination at step five is the only issue in this case.  At step five, if the claimant

14   is not capable of performing past relevant work, the ALJ determines whether the claimant can

15   perform any other work based on the claimant's residual functional capacity ("RFC"), age, education,

16   and work experience.  20 C.F.R. § 404.1520(b)-404.1520(f)(1).  Here, the ALJ found that Plaintiff

17   has the RFC to perform a significant number of alternate occupations existing in the national

18   economy.  (AR 32.)  On appeal, Plaintiff contends that this finding is not supported by substantial

19   evidence because: (1) the ALJ impermissibly dismissed the opinions of Dr. Townsend and Dr.

20   Wilson; (2) the ALJ impermissibly dismissed Dr. Cain's opinion; (3) the ALJ impermissibly

21   discounted Plaintiff's hearing testimony, and (4) notwithstanding the dismissals of these opinions,

22   Plaintiff is disabled under Social Security Ruling 96-9p because her remaining job options are

23   "significantly eroded."  The Court will address each in turn.

I.       **THE ALJ'S CONSIDERATION OF THE MEDICAL EVIDENCE**

25       Plaintiff's motion for summary judgment urges that the ALJ did not assign the proper weight

26   to certain treating sources' testimony.  The Court concludes that the ALJ erred due to a failure to

27   provide sufficient reasons for rejecting the opinions of several medical sources.

28

**A.**      **The Standard for Weighing Medical Evidence**

As a threshold matter, the ALJ must consider all medical opinion evidence. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527(b)).  However, the Ninth Circuit has "developed standards that guide [its] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  A reviewing court must "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Each type of opinion is accorded a different level of deference:  "the opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).  Courts afford the medical opinions of treating physicians superior weight because these physicians are in a better position to know plaintiffs as individuals, and because the continuity of their treatment improves their ability to understand and assess an individual's medical concerns. *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).  Thus, if a treating physician's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence. *See Ryan*, 528 F.3d at 1198.  The ALJ should assign "controlling weight" to a treating doctor's opinion where medically approved diagnostic techniques support the opinion and it is consistent with other substantial evidence. *See* 20 C.F.R. § 404.1527(d)(2); *Orn v. Astrue*, 495 F.3d 625, 623-33 (9th Cir. 2007).

To determine which medical opinion should control, an ALJ looks to factors including the length of the treatment relationship, frequency of examination, nature and extent of treatment relationship, consistency of opinion, evidence supporting the opinion, and the doctor's specialization. *See* 20 C.F.R. § 404.1527(d)(2)-(d)(6).  If the ALJ rejects a treating or examining doctor's opinion that is contradicted by another doctor, she must provide specific, legitimate reasons based on substantial evidence in the record. *See Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009).  "The ALJ can meet this burden by setting out a detailed and thorough summary of

United States District Court
Northern District of California

the facts and conflicting medical evidence, stating [her] interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986).  In contrast, "[w]hen an ALJ does not explicitly reject a medical opinion or set forth specific legitimate reasons for crediting one medical opinion over another, [s]he errs.  In other words, an ALJ errs when [s]he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for [her] conclusion."  *Garrison*, 795 F.3d at 1012-13 (internal citation omitted).

Here, regarding Plaintiff's physical conditions, the ALJ gave great weight to Dr. Boorstein's opinion, partial weight to the examining Agency doctors Dr. Boparai and Dr. Williams, and little weight to Dr. Wilson; in other words, she adopted the opinions of doctors who saw Plaintiff once each, rather than her treating physician at Clinic Ole or the extensive medical opinions of other treating doctors.  (AR 28-29.)  Similarly, the ALJ gave great weight regarding Plaintiff's psychological conditions to examining psychologist Dr. Cain rather than Plaintiff's treating psychologist Dr. Townsend.  (AR 30-31.)

**B.     The ALJ Improperly Weighed Dr. Townsend's Medical Opinion**

If an ALJ rejects the opinion of a treating physician, she must provide "clear and convincing reasons" supported by substantial evidence in the record for that rejection unless she cites a contradicting medical opinion.  *See Ryan*, 528 F.3d at 1198.  Here, the ALJ gave "[p]artial weight" to Dr. Townsend's opinion for two reasons: first, that the record as a whole did not support Dr. Townsend's findings that Plaintiff had any "extreme limitations," and second, the ALJ stated that Dr. Townsend relied too heavily on Plaintiff's self-reported symptoms. [6]  (AR 31.)  These rationales are not "clear and convincing" reasons to reject Dr. Townsend's opinion.

---

[6] In their submissions to the court, both parties address the question of whether Ms. Hardy, the licensed clinical social worker, constitutes an "acceptable medical source."  (*See, e.g.*, Dkt. No. 18 at 4-5, Dkt. No. 17 at 10.)  However, in her decision, the ALJ assumes that Dr. Townsend, not Ms. Hardy, is the relevant treating source.  (AR 31.)  The limited weight she accords to Dr. Townsend's opinion is based on its inconsistencies and reliance on Plaintiff's self-reporting, *not* Ms. Hardy's status as a social worker.  (*Id.*)  Nurse practitioners, physician's assistants, and other health professionals are considered "other sources."  20 C.F.R. § 404.1513(d); *see also Garrison v. Colvin*, 759 F.3d 995, 1013-14 (9th Cir. 2014) (noting that nurse practitioners are "other sources that can

1       The medical record belies the ALJ's finding that the record does not support Dr. Townsend's

2   conclusion that Plaintiff had any extreme limitations in maintaining attention, concentration, regular

3   attendance, or a normal workday or workweek.  (AR 31.) The record is replete with numerous

4   medical evaluations consistent with these limitations.  For example, Dr. Cain, to whom the ALJ gave

5   "great weight" (AR 30), found that Plaintiff will have difficulty with attendance at work.  (AR 748.)

6   Dr. Zukowsky found Plaintiff was moderately limited in her concentration.  (AR 760.)  Dr. Ballesca,

7   Plaintiff's primary care physician from 2008 to 2010, routinely approved Plaintiff's disability

8   paperwork allowing her three days off per month for her headaches and chronic pain, as well as

9   Verification of Treatment forms that permitted Plaintiff to take time off for medical appointments or

10  to deal with her pain. (*See, e.g,.* AR 260-61, 269, 461-63, 495-501, 504.)  Even Dr. Boorstein, to

11  whom the ALJ was very deferential, approved an extension of Plaintiff's disability allowing her to

12  take additional time off of work.  (AR 347.)  The record thus supports that Plaintiff would have

13  difficulty with concentration, attendance, and a typical work schedule.  Because the ALJ failed to

14  address this evidence, her statement that Dr. Townsend's opinion is unsupported is conclusory rather

15  than "convincing."

16      The ALJ's second reason for discounting Dr. Townsend—that she relied "quite heavily" on

17  Plaintiff's subjective reports of symptoms and limitations, accepting Plaintiff's account

18  "uncritically"—fares no better.  (AR 31.)  "[A]n ALJ does not provide clear and convincing reasons

19  for rejecting an examining physician's opinion by questioning the credibility of the patient's

20  complaints where the doctor does not discredit those complaints and supports [her] ultimate opinion

21  with [her] own observations."  *Ryan*, 528 F.3d at 1194.  The Ninth Circuit recently reiterated that

22  ALJs may not reject medical opinions simply because they are based on a patient's subjective

23  complaints: "when an opinion is not more heavily based on a patient's self-reports than on clinical

24  observations, there is no evidentiary basis for rejecting the opinion."  *Ghanim v. Colvin*, 763 F.2d

25  1155, 1162 (9th Cir. 2014)(internal citation omitted).  An ALJ may only discount a treating

26

27  provide evidence about the severity of [a claimant's] impairment(s) and how it affects [the claimant's]
    ability to work.).  "[A] nurse practitioner working in conjunction with a physician constitutes an
28  acceptable medical source, while a nurse practitioner working on his or her own does not."  *Gomez v.
    Chater*, 74 F.3d 967, 971 (9th Cir. 1996).

1   physician's opinion because it is based largely on a patient's self-reporting when the diagnosis is not

2   supported by clinical evidence and the ALJ also finds that the patient is not credible.  *Id.*

3          The case *Esposito v. Astrue*, No. 10-2862, 2012 WL 1027601, at *1 (E.D. Cal. Mar. 26,

4   2012), illustrates this point.  There, the plaintiff was diagnosed with, among other things, a mood

5   disorder and obsessive compulsive disorder.  *Id.* at *4.  His treating psychiatrist completed a form

6   about the plaintiff's mental disorder where he determined that the plaintiff had "poor concentration

7   and focus" and "minimal ability to adapt to the stresses of the work environment."  *Id.* at *5.  In

8   contrast to the psychiatrist's opinion, the ALJ found that the plaintiff was only slightly limited in

9   those areas.  *Id.*  According to the ALJ, the psychiatrist's opinion deserved little weight because it

10  was contradicted by the plaintiff's reports about his daily living activities, and because it "may have

11  been based" on the plaintiff's subjective complaints.  *Id.* at *6.  In remanding for an award of

12  benefits, the *Esposito* court noted that "the practice of psychology depends, at least in part, on the

13  subjective complaints of the patient."  *Id.* (internal citations omitted).  Because there was nothing in

14  the record to suggest that the psychiatrist did not believe the plaintiff's complaints, and the

15  psychiatrist supported his assessment with clinical observations, *see Ryan*, 528 F.3d at 1194, the court

16  concluded that the ALJ improperly dismissed the doctor's opinion.  *Id.* at *6; *see also Stanley v.*

17  *Astrue*, No. 10-0563, 2011 WL 4565873, at *7 (E.D. Cal. Sept. 29, 2011) (holding that "mental

18  illness . . . is often diagnosed based on a patient's subjective reports," and an ALJ's "assertion that the

19  treating physicians based their diagnoses on plaintiff's subjective remarks and medical history is not a

20  'clear and convincing' reason for rejecting their opinions.").

21         Here, the ALJ likewise failed to identify any evidence that showed Dr. Townsend disbelieved

22  Plaintiff's subjective reports.  (AR 31.)  Moreover, Ms. Hardy—on whose opinion Dr. Townsend's

23  opinion is based—supported her opinion with her objective observation that over her six visits with

24  Plaintiff, she "did not show much improvement and continued to be significantly impaired by her

25  depression, anxiety[, and] chronic pain."  (AR 943.)  Finally, as will be discussed below, the ALJ

26  erred in finding Plaintiff not credible.  There is no indication in the record that Dr. Townsend relied

27  more on Plaintiff's complaints than her clinical observations, and as discussed below, the Court

28  rejects the ALJ's conclusion that Plaintiff's pain complaints were not credible.

United States District Court
Northern District of California

1    Thus, because the ALJ did not cite evidence contrary to Dr. Townsend's opinion, failed to

2    address supporting evidence, and improperly discounted Dr. Townsend's reliance on Plaintiff's self-

3    reported symptoms, the ALJ failed to provide clear and convincing reasons for giving the opinion

4    partial weight.  *See Garrison*, 795 F.3d at 1012-13 (internal citation omitted).

5    **C.      The ALJ Improperly Weighed Dr. Wilson's Medical Opinion**

6    The ALJ also rejected Dr. Wilson's opinion regarding Plaintiff's RFC because she found it

7    internally inconsistent.[7]  (AR 29.)  Dr. Wilson indicated on a form that Plaintiff could walk for three

8    hours, stand for two hours, sit for four hours, and needed to lie down for four hours (AR 934);

9    because this totals 13 hours, the ALJ found it an inconsistent assessment of Plaintiff's abilities for an

10   eight-hour workday.  (AR 29.)  The ALJ also disregarded the opinion because it was inconsistent

11   with the record as a whole, identified "significant manipulative limitations" for which the ALJ found

12   no evident impairments, and was "far too conclusory."  (AR 29.)  The Court addresses the validity of

13   each of these reasons in turn.

14   **1.      *Inconsistency with Other Medical Opinions***

15   The ALJ did not specifically cite which opinions contradicted Dr. Wilson's.  (AR 29.)

16   However, on the previous page, she accorded great weight to the opinion of Dr. Boorstein, who

17   determined that Plaintiff's symptoms could be treated by posture correction, stretching, and a change

18   of career.  (AR 28.)  Presumably, the ALJ found Dr. Boorstein's opinion at odds with Dr. Wilson's

19   assertion that Plaintiff had a number of severe limitations and was not capable of performing

20   sedentary work.  However, this is not a specific and legitimate reason to discredit Dr. Wilson's

21   opinion for three reasons.  First, an ALJ must do more than merely "identify conflicting evidence."

22   *Long v. Colvin*, No. 13-CV-05716-SI, 2015 WL 971198, at *5 (N.D. Cal. Mar. 3, 2015).  She must

23   also "provide her interpretation [of the conflicting evidence], and explain why her interpretation,

24   rather than the treating physician's prevails."  *Id.* at *6.  Here, not only did the ALJ fail to provide her

25

26   _____

     [7] As with Dr. Townsend and Ms. Hardy, the ALJ noted that the record was unclear whether Dr.
27   Wilson or Ms. Sonderer, the nurse practitioner, actually treated Plaintiff.  (AR 29.)  However, the ALJ
     did not present this ambiguity as a reason to discredit the opinion and "a nurse practitioner working in
28   conjunction with a physician constitutes an acceptable medical source, while a nurse practitioner
     working on his or her own does not." *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996).

own interpretation of the evidence, she failed to state specifically *what* evidence conflicted with Dr. Wilson and FNP Sonderer's opinion.

Second, the ALJ's reason is not specific and legitimate because she did not consider any of the factors relevant to determining which medical opinion(s) should control (the treatment relationship, frequency of examination, nature and extent of treatment relationship, consistency of opinion, evidence supporting the opinion, and the doctor's specialization). *See* 20 C.F.R. § 404.1527(d)(2)-(d)(6). Had she engaged in this analysis, the following facts may have tipped the scale in favor of giving controlling weight to Dr. Wilson's opinion rather than Dr. Boorstein's: that Dr. Boorstein saw Plaintiff only once; that she was referred to him only for her neck pain; that numerous other doctors saw fit to treat Plaintiff with physical therapy, injections, pain medications, and options besides career changes or stretching; that he admittedly failed to consider her psychiatric ailments; and that other doctors considering the same objective evidence (*e.g.*, x-rays and MRIs) found that it supported her pain complaints.

Finally, as described above, there are numerous medical records and opinions that support the conclusion that Plaintiff has severe limitations and is incapable of sedentary work; the ALJ herself found that Plaintiff had, among other illnesses, severe obesity, degenerative disc disease, myofascial pain syndrome, and fibromyalgia. (AR 22.) Consequently, the ALJ's conclusion that Dr. Wilson's findings are unsupported is not based on substantial evidence in the record and therefore cannot serve as a specific, legitimate reason to discount his opinion. *See Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (holding that if the ALJ rejects a treating or examining doctor's opinion that is contradicted by another doctor, she must provide specific, legitimate reasons based on substantial evidence in the record).

## 2. *Significant Manipulative Limitations*

Similarly, the ALJ's conclusion that there is no evidence in the record to support Plaintiff's severe manipulative limitations does not constitute a specific, legitimate reason to discount Dr. Wilson's opinion. Once again, the ALJ used boilerplate language to dismiss an opinion without setting forth a detailed explanation for her decision. *See Garrison*, 795 F.3d at 1012-13. She neither cites to previous evaluations that failed to find manipulative limitations to support her conclusion, nor

acknowledges medical records that support a finding of significant manipulative limitations.  (*See, e.g.*, AR 343 (Dr. Gao diagnosed Plaintiff with fibromyalgia); AR 534-557 (Dr. Ballesca routinely treated Plaintiff for muscle pain); AR 43 (Plaintiff described "reaching" as a motion that severely aggravates her pain).)  The ALJ has thus failed to provide a specific, legitimate reason based on substantial evidence to discount Dr. Wilson's opinion with regard to Plaintiff's manipulative limitations.  *See Long*, 2015 WL 971198, at *5-6.

### 3.     *Conclusory Nature*

An ALJ does not have to "accept an opinion of a physician—even a treating physician—if it is conclusory and brief and is unsupported by clinical findings."  *Matney on Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).  According to the SSA's own regulations, "[t]he better an explanation a source provides for an opinion, the more weight [ALJs] will give that opinion."  20 C.F.R. §404.1527(c)(3).  However, "[t]he Ninth Circuit has held that check-box forms that are based on significant experience with the claimant and supported by numerous records are 'entitled to weight that an otherwise unsupported and unexplained check-box form would not merit.'" *Long*, 2015 WL 971193, at *6 (citing to *Garrison,* 759 F.3d at 1013).

For example, in *Long*, the ALJ dismissed a medical opinion from a check-box form.  *Id.* However, because the doctor who completed the form "had been treating the plaintiff for several months" prior to his completion of the form, "and the notes from [that] course of treatment [were] contained in the record," the court held "it was error for the ALJ to dismiss [the doctor's] findings because they were contained in a check-box form without further explanation."  *Id.*

Here, Dr. Wilson likewise completed a form by checking boxes and circling numerical ratings of Plaintiff's capabilities.  (AR 932-36.)  The only additional commentary provided was that Plaintiff had "chronic neck pain [and] limited mobility due to pinched nerves in [her] neck."  (AR 936.) However, as in *Long*, the record shows that Dr. Wilson (and/or Ms. Sonderer) had been treating Plaintiff for months prior to completing her disability form.  The ALJ therefore erred in disregarding their medical source statement based on the fact that it was provided on a form.  *See Long*, 2015 WL 971193, at *6.

### 4.    *Internal Inconsistency*

"The ALJ is responsible for resolving conflicts in medical testimony, and resolving ambiguity." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999) (internal citation omitted.) "Determining whether inconsistencies are material (or in fact inconsistencies at all) . . . falls within this responsibility." *Id.*

The ALJ deemed Dr. Wilson's opinion internally inconsistent because he assessed Plaintiff as being capable of and/or requiring 13 hours of walking, standing, sitting, and lying down in an eight-hour workday.  (AR 29.)  Typically, however, finding a medical opinion internally inconsistent refers to conflicting prognoses or assessments of abilities.  *See, e.g. Zettelmier v.* Astrue, 387 F. App'x 729, 731-32 (9th Cir. 2010) (upholding ALJ's determination that a physician's opinion was internally inconsistent where he alternated between concluding plaintiff could be completely treated with medication and concluding that plaintiff would nonetheless suffer limitations from her illness); *Watkins v. Astrue*, 357 F. App'x 784, 786 (9th Cir. 2009) (upholding ALJ's determination that a physician's opinion was internally inconsistent when he deemed the plaintiff's prognosis "good" in contrast to a grim RFC determination).  Even if this were to constitute an inconsistency, it cannot stand alone as a specific and legitimate reason to discount Dr. Wilson's opinion.  It is possible that Dr. Wilson made a mathematical error or misunderstood what the form was asking in that particular section.  Moreover, even if the ALJ were to strike the portion of the opinion she found inconsistent, Dr. Wilson's opinion would still support a finding of disability as he listed so many other physical limitations for her.  (*See, e.g.* AR 934 (Plaintiff needs to rest or change positions after sitting for one hour, standing for one hour, or walking for two hours; Plaintiff can only reach or handle objects for thirty minutes per day).)

In sum, because the reasons provided by the ALJ to dismiss Dr. Wilson's opinion were not specific and legitimate, the ALJ's dismissal of his opinion was improper.

### D.    **The ALJ Improperly Dismissed Dr. Cain's Opinion in Part**

Plaintiff next contends that the ALJ made two errors regarding Dr. Cain's psychological evaluations of Plaintiff: first, by failing to provide reasons why she "silently disregarded" Dr. Cain's

second opinion of Plaintiff, and second, despite according it great weight, the ALJ failed to

incorporate portions of Dr. Cain's initial evaluation in her RFC of Plaintiff.

### 1.   *The ALJ Erred in Dismissing Dr. Cain's Second Opinion*

In assessing Plaintiff's mental health, the ALJ gave great weight to Dr. Cain's first opinion

"because it [was] consistent with her objective findings on evaluation and, for the most part, the

record as a whole." (AR 30.)  While the ALJ also details Dr. Cain's second opinion, she does not

describe how much weight she gives it, and does not resolve the inconsistency between the two—

namely that Dr. Cain indicated Plaintiff would have "difficulties with attendance secondary to her

emphasis on pain." (AR 30.)  The ALJ made no findings that Plaintiff would have difficulty with

attending, and therefore maintaining, a job. (AR 26.)

As outlined above, an ALJ errs when she fails to provide "specific legitimate reasons" for

rejecting a medical opinion.  *Garrison*, 795 F.3d at 1012-13 (internal citation omitted).  While an ALJ

need not discuss evidence that is neither significant nor probative, *see Howard ex rel. Wolff v.

Barnhart*, 341 F.3d 1008, 1012 (9th Cir. 2003), Dr. Cain's statement about Plaintiff's difficulties with

attendance cannot reasonably be characterized as insignificant.  It speaks directly to Plaintiff's ability

to work—at least, to maintain employment.[8]

The ALJ provided no reasons why she disregarded Dr. Cain's significant statement that

Plaintiff would experience difficulties with work attendance.[9]  (AR 30.)  Because she ignored the

---

[8] When Plaintiff's attorney presented the VE with a hypothetical with attendance issues, the VE
concluded it would be unlikely for such an individual to be able to keep a job in either of the positions
the VE put forth.  (AR 72.)

[9] In her opposition to Plaintiff's motion for summary judgment, Defendant asserts that "it is
reasonable to infer" that the ALJ disregarded Dr. Cain's second opinion because it relied too heavily
on Plaintiff's subjective descriptions.  (Dkt. No. 17 at 13.)  This argument is unavailing for two
reasons.  First, as set forth above, ALJs may not discount a plaintiff's subjective testimony regarding
her own mental impairments without evidence that the examining physician had reason to disbelieve
Plaintiff or failed to support the conclusion with objective findings.  *See Ryan,* 528 F.3d at 1194.
Second, when reviewing a disability decision, the court may "review only the reasons provided by the
ALJ."  *Orn*, 495 F.3d 625, 630 (9th Cir. 2007).  Here, the ALJ did not state she was disregarding Dr.
Cain's second opinion because of its reliance on Plaintiff's reports; thus, the Court may not consider
that argument.  *See id.*

United States District Court
Northern District of California

1   finding of an examining physician without providing a "substantive basis" to do so, she erred.

2   *Garrison*, 795 F.3d at 1012-13 (internal citation omitted.)

3   **2.   *The ALJ Did Not Improperly Disregard Dr. Cain's First Opinion***

4   Plaintiff additionally argues that the ALJ failed to accurately address Dr. Cain's opinion that

5   Plaintiff would "have difficulty responding appropriately to coworkers, supervisors, and the general

6   public" in her RFC finding.  (Dkt. No. 16 at 19.)

7   An RFC is "the maximum degree to which the individual retains the capacity for sustained

8   performance of the physical-mental requirements of jobs."  *See* 20 C.F.R. § 404.1545(a).  "In

9   determining a claimant's RFC, an ALJ must consider all relevant evidence in the record, including,

10  [among other things,] medical records, lay evidence, and the effects of symptoms, including pain, that

11  are reasonably attributed to a medically determinable impairment."  *Robbins v. Soc. Sec. Admin*, 466

12  F.3d 880, 880 (9th Cir. 2006) (internal citations and quotations omitted); 20 C.F.R. §§

13  404.1545(a)(3), 416.945(a)(3).

14  As noted above, the ALJ found that Plaintiff had the RFC to perform sedentary unskilled

15  work subject to the following limitations:  occasional contact with supervisors, co-workers, and the

16  public; lifting or carrying ten pounds frequently; sitting for six hours in an eight hour work day;

17  standing or walking for two hours in an eight hour work day; no walking on uneven terrain or

18  climbing ladders, ropes, or scaffolding; occasional balancing, stooping, kneeling, crouching,

19  crawling, or climbing of ramps and stairs; avoiding concentrated exposure to extreme cold and

20  vibration; and avoiding exposure to hazards.  (AR 26.)

21  Plaintiff argues that in posing hypothetical situations to the VE, the ALJ failed to explicitly

22  mention Dr. Cain's opinion that Plaintiff would have difficulty dealing with coworkers, supervisors,

23  and the general public.  However, the ALJ *did* introduce the restriction of occasional contact with

24  those parties.  (AR 70.)  And when pressed on the nature of social contact in the recommended jobs,

25  the VE testified that "[t]hey don't have to interact with coworkers and supervisors"—once a

26  hypothetical individual completed her job training, "[coworkers or supervisors] might come by but

27  they don't check up on you."  (AR 70.)  Difficulty with others is not equivalent to a total inability to

28  deal with others.  Thus it appears that the ALJ's "occasional contact" restriction adequately

1  encompassed Plaintiff's mental health restrictions, particularly given that an RFC should reflect an

2  individual's *maximum* capacity.  *See Robbins v. Soc. Sec. Admin*, 466 F.3d at 880.

3        In sum, the ALJ made three errors regarding Plaintiff's medical evidence.  First, she failed to

4  provide clear and convincing reasons to discount Dr. Townsend's opinion on Plaintiff's psychological

5  limitations.  Second, she did not provide specific and legitimate reasons to discount Dr. Wilson's

6  opinion about Plaintiff's physical limitations.  Third, while the ALJ gave appropriate consideration to

7  Dr. Cain's first opinion about Plaintiff's psychological abilities, she gave no substantive basis to

8  ignore Dr. Cain's second opinion.

9  **II.  THE ALJ'S DISMISSAL OF PLAINTIFF'S TESTIMONY**

10        Plaintiff next asserts that the ALJ did not provide a sufficient basis to find Plaintiff's

11  subjective testimony "not entirely credible" with regard to "the intensity, persistence, and limiting

12  effects of [her] symptoms."  (Dkt. No.16 at 20; AR 27.)

13        **A.        The Standard for Assessing Credibility**

14        The standard to determine whether a claimant's testimony is credible is different from the

15  standard used above for rejecting a physician's testimony that is *based* on a claimant's subjective

16  complaints.  To "determine whether a claimant's testimony regarding subjective pain or symptoms is

17  credible," an ALJ must use a "two-step analysis."  *Garrison*, 759 F.3d at 1014.  "First, the ALJ must

18  determine whether the claimant has presented objective medical evidence of an underlying

19  impairment which could reasonably be expected to produce the pain or other symptoms alleged."

20  *Lingenfelter v. Astrue*, 504 v. F.3d 1028, 1036 (9th Cir. 2007) (internal citations and quotation marks

21  omitted).  "Second, if the claimant meets the first test, and there is no evidence of malingering, the

22  ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific,

23  clear and convincing reasons for doing so."  *Id.*  (internal citations and quotation marks omitted).

24        An ALJ is not "required to believe every allegation of disabling pain."  *Fair v. Bowen*, 885

25  F.2d 597, 603 (9th Cir. 1989).  A claimant's credibly is most commonly called into question where

26  his or her complaint is about "disabling pain that cannot be objectively ascertained."  *Orn*, 495 F.3d

27  at 637.  "In weighing a claimant's credibility, the ALJ may consider [her] reputation for truthfulness,

28  inconsistencies either in [her] testimony or between [her] testimony and [her] conduct, [her] daily

United States District Court
Northern District of California

activities, [her] work record, and testimony from physicians and third parties concerning the nature, severity, and effects of the symptoms of which [she] complains. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). "To support a lack of credibility finding" about a claimant's subjective pain complaints, an ALJ must "point to specific facts which demonstrate that [the claimant] is in less pain than she claims." *Vasquez v. Astrue*, 572 F.3d 586, 591-92 (9th Cir. 2009) (internal citation and quotation omitted).

**B.     The ALJ Improperly Discounted Plaintiff's Testimony**

Applying the two-step analysis, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms" but Plaintiff's testimony was not entirely credible "concerning the intensity, persistence, and limiting effects of those symptoms." (AR 27.) Because the ALJ did not find that Plaintiff was malingering, she was required to set forth specific, clear and convincing reasons for rejecting Plaintiff's subjective testimony, *see Lingenfelter*, 504 F.3d at 1036, and to consider the relevant credibility factors. *See Light*, 119 F.3d at 792. A review of the record indicates that the ALJ failed to weigh the relevant factors or set forth clear and convincing reasons to discredit Plaintiff.

The ALJ provided the following explanations as to why she discredited Plaintiff's subjective complaints: the "objective record does not support" Plaintiff's claim that she has to stay in bed; her medical records indicated no complaints about side effects from her medications; she has been "exceptionally focused on obtaining disability benefits"; her allegations seem exaggerated; and the record contained evidence of "drug-seeking behavior." (AR 31.) Although subjective pain testimony that is not fully corroborated by objective medical evidence is relevant to determining the severity of Plaintiff's pain and its disabling effects, it cannot be the sole reason to discredit subjective pain complaints. *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2011). Thus, the Court must consider the ALJ's other reasons for rejecting Plaintiff's subjective reports.

**1.     *Medication Side Effects***

The ALJ cited the lack of support in the record for Plaintiff's claims of medication side effects including dizziness, drowsiness, and difficulty concentrating as reason to discredit her testimony. (AR 31.) However, even if Plaintiff's testimony about medication side effects was not credible, she

United States District Court
Northern District of California

is not seeking disability based on those side effects.  In fact, Plaintiff did not independently provide details about the side effects she experienced; she was responding to one of the ALJ's questions.  (AR 45-46.)  Thus, inconsistencies or a lack of evidence regarding Plaintiff's side effects do not constitute a clear and convincing reason to discount her other testimony.

### 2. *Focus on Disability Benefits*

Courts in this district have yet to rule on the whether claimants' interest in seeking disability benefits constitutes a legitimate reason to discredit their testimony, but multiple other district courts have held that it does not.  *See, e.g,. Murillo v. Colvin*, No. 12-3402, 2013 WL 5434168, at *12 (C.D. Cal. Sept. 27, 2013) ("To the extent the ALJ also found plaintiff to be not credible because he was 'benefit-seeking,' '[g]enerally speaking [] every claimant who applies for benefits seeks pecuniary gain, and this fact does not indicate a lack of credibility.") (citing *Bell v. Colvin*, 2013 WL 1163956 (C.D. Cal. March 20, 2013) and  *Ratto v. Sec'y, Dept. of Health & Hum. Servs.*, 839 F.Supp 1415, 1428-29 (D. Or. 1993)); *Lara v. Colvin*, No. 12-00693, 2013 WL 4763652, at *5 (C.D. Cal. Sept. 4, 2013) (holding that the ALJ's assertion that the plaintiff was benefit-seeking does not constitute a clear and convincing reason to find the plaintiff not credible).

The Court is persuaded by this logic; it is unfair to conclude that Plaintiff is less credible because she has persistently sought disability benefits.  "If the desire or expectation of obtaining benefits were by itself sufficient to discredit a claimant's testimony, then no claimant . . . would ever be found credible." *Ratto v. Sec'y, Dep't of Health & Human Servs.*, 839 F. Supp. 1415, 1429 (D. Or. 1993).  Thus, Plaintiff's previous attempts to secure disability benefits do not constitute a clear and convincing reason to discredit her testimony.

### 3. *Exaggerated Allegations*

According to the ALJ, Plaintiff exaggerates her symptoms; for example, Plaintiff marked a diagram to show she felt pain all over her body during a medical visit.  (AR 32.)  How this constitutes exaggeration, however, is left unexamined.  Plaintiff has reported pain on most parts of her body to doctors for years.  (*See, e.g.,* AR 343 (Plaintiff complained of neck and shoulder pain), AR 264 (Plaintiff complained of back pain), AR 269 (Plaintiff complained of stomach pain), AR 448 (Plaintiff complained of chest and arm pain, AR 272-73 (Plaintiff complained of leg pain).)  These

United States District Court
Northern District of California

33

United States District Court
Northern District of California

complaints are consistent with Plaintiff's fibromyalgia and myofascial pain syndrome diagnoses.[10] Moreover, the ALJ herself found that Plaintiff had severe fibromyalgia and myofascial pain syndrome—both impairments that present with significant pain throughout the body.  (AR 22.)  Thus, Plaintiff's complaints of pain over different parts of her body throughout the record are supported by these diagnoses and by the ALJ's own findings; that Plaintiff would indicate such pain on a medical form does not constitute a clear and convincing reason to discredit her testimony.

### 4. *Drug-Seeking Behavior*

"When a claimant has a nonmedical motive to exaggerate symptoms in order to obtain drugs, an ALJ may permissibly discredit the claimant."  *Jaureque v. Colvin*, No. 11-06358, 2013 WL 1149587, at *5 (N.D. Cal. Mar. 19, 2013) (citing to *Edland v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001) (holding that the likelihood claimant exaggerated his pain complaints to his physician to obtain painkillers was a clear and convincing reason to discredit claimant)).  Thus, a court must defer to an ALJ's reasonable interpretation that a claimant has engaged in drug-seeking behavior and is therefore not entirely credible.  *Massey v. Comm'r Soc. Sec. Admin.*, 400 F. App'x 192, 194 (9th Cir. 2010).

Although such behavior may constitute a clear and convincing reason to discredit a claimant, *see Jaureque*, 2013 WL 1149587, at *5, when discounting pain testimony in particular, an ALJ must "point to specific facts which demonstrate that [the claimant] is in less pain than she claims."  *See Vasquez*, 572 F.3d 586 at 591-92.  In other cases where claimants' drug-seeking behavior was identified as a reason to discount their testimony, specific evidence of their behavior was outlined as emblematic of a tendency to *exaggerate* pain.  For example, in *Edlund*, the ALJ concluded that claimant was likely not credible because he was deceiving a specific doctor about his need for pain medication due to a "Valium addiction."  *Edlund v. Massanari*, 253 F.3d 1152, 1157-58 (9th Cir. 2001).  Likewise, in *Alexander*, the record showed the claimant was barred from seeking narcotics from certain doctors, and multiple doctors questioned her underlying diagnoses and suggested her

---

[10] ALJs should pay particular attention to a plaintiff's subjective pain complaints when she has fibromyalgia; an ALJ may not "effectively requir[e] 'objective' evidence for a disease that eludes such measurement . . . sheer disbelief [of a plaintiff's complaint] is no substitute for substantial evidence."  *Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004)(internal citation and quotation omitted).

1    pain complaints were hyperbolic.  *Alexander v. Comm'r of Soc. Sec.*, 373 F. App'x 741, 743-44 (9th

2    Cir. 2010).

3           Here, in contrast, the ALJ merely wrote a single line that Plaintiff exhibited drug-seeking

4    behavior.  (AR 29.)  She did not cite to specific examples of such behavior, or analyze how it

5    demonstrates that Plaintiff is in any less pain than she claims to be.  (*Id.*)  Moreover, the record

6    contains significant evidence that Plaintiff sought drugs to treat her underlying pain and/or because of

7    complications from her limited finances and insurance coverage—neither of which indicate that

8    Plaintiff was exaggerating her symptoms.  (*See, e.g.*, AR 506-07 (Plaintiff's primary care physician

9    prescribed her Soma for pain), AR 389 (Plaintiff went to the ER to get a medication refill after she

10   lost her private insurance).)   Because the ALJ failed to use specific facts to support her conclusion

11   that Plaintiff is not credible due to her drug-seeking behavior, or adequately analyze conflicting

12   evidence, this does not constitute a clear and convincing reason to discount her testimony.

13          In short, the ALJ neither considered the appropriate factors to weigh Plaintiff's credibility

14   (*e.g.*, her reputation for truthfulness, or her work record), nor were the reasons she set forth specific,

15   clear and convincing.  *See Light*, 119 F.3d at 792; *Lingenfelter*, 504 F.3d at 1036.  Thus, the ALJ

16   erred in discrediting of Plaintiff's pain testimony.

### III.     EROSION OF THE SEDENTARY OCCUPATIONAL BASE

18          Lastly, Plaintiff contends that she is disabled under Social Security Ruling 96-9p ("SSR 96-

19   9p") because the occupational base available to her is "significantly eroded."  (Dkt. No. 16 at 24-25.)

20   To support her argument, she cites Social Security Ruling 96-9p:  "a finding of 'disabled' usually

21   applies when the full range of sedentary work is significantly eroded."  (Dkt. No. 24.)  While the

22   Social Security Ruling states when "a finding of disability *usually* applies, neither the Medical-

23   Vocational Guidelines nor any social Security Ruling *require* a finding of disability."  *Long v. Colvin*,

24   No. 13-CV-05716-SI, 2015 WL 971198, at *11 (N.D. Cal. Mar. 3, 2015) (rejecting a similar

25   argument as "without merit").  Plaintiff does not cite any authority that mandates an ALJ make a

26   finding of disability under these circumstances; thus, Plaintiff's argument that the ALJ was required

27   to find Plaintiff disabled fails.  *See id*.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.     THE SCOPE OF REMAND**

Plaintiff asks the Court to remand for immediate benefits under the credit-as-true rule.   A court may remand for an immediate award of benefits where "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison v. Colvin,* 759 F.3d 995, 1020 (9th Cir. 2014).  Each part of this three-part standard must be satisfied for the court to remand for an award of benefits, *id.*, and "[i]t is the 'unusual case' that meets this standard." *Williams v. Colvin*, No. 12-CV-6179, 2014 WL 957025, at *14 (N.D. Cal. Mar. 6, 2014) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004).)  Here, all three prongs are met and this is thus the unusual case that warrants an award of benefits.

First, although a remand might serve the "'useful purpose' of allowing the ALJ to revisit the medical opinions and testimony that she rejected for legally insufficient reasons, our precedent and the objectives of the credit-as-true rule foreclose the argument that a remand for the purpose of allowing the ALJ to have a mulligan qualifies as a remand for a 'useful purpose' under the first part of credit-as-true analysis." *Garrison*, 759 F.3d at 1021-22; *see also Benecke*, 379 F.3d at 595 ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication."); *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir. 2004) ("The Commissioner, having lost this appeal, should not have another opportunity to show that Moisa is not credible any more than Moisa, had he lost, should have an opportunity for remand and further proceedings to establish his credibility." (citation omitted)).

Second, as discussed at length above, the ALJ failed to provide a legally sufficient reason to reject Plaintiff's pain testimony and the opinions of her treating and examining physicians.  In particular, the ALJ failed to provide clear and convincing reasons to discount Dr. Townsend's opinion of Plaintiff's psychological limitations, failed to provide specific and legitimate reasons to discount Dr. Wilson's opinion about Plaintiff's physical limitations, and gave no substantive basis to ignore the second opinion of state agency examining physician Dr. Cain that Plaintiff would have

36

1  significant issues with attendance after giving great weight to Dr. Cain's first opinion regarding

2  Plaintiff's psychological abilities.  Further, the ALJ's reasons for rejecting Plaintiff's pain testimony

3  were not supported by specific clear and convincing reasons.

4       Third, if this improperly discredited evidence were credited as true, the ALJ would be

5  required to find Plaintiff disabled on remand.  This conclusion is supported by the significance of the

6  improperly discounted medical evidence and the testimony of the vocational expert.  Dr. Townsend

7  concluded that Plaintiff had extreme limitations in maintaining attention and concentration,

8  maintaining regular attendance, and completing a normal workday or week.  Dr. Cain likewise

9  concluded that Plaintiff would have difficulty with attendance.  Dr. Wilson concluded that Plaintiff

10  had a number of severe limitations and was not capable of performing sedentary work and opined that

11  Plaintiff would need to lay down for four hours every day.  According to the VE an individual with

12  these limitations—the need to miss three days of work per month due to her impairments and lay

13  down for four hours a day—could not find and/or maintain gainful employment in the national

14  economy.   Accordingly, if the improperly discounted and ignored medical opinions were credited as

15  true, the ALJ would be required to find Plaintiff disabled on remand.

16       This case thus satisfies the requirements of the credit-as-true standard.  Because "an

17  evaluation of the record as a whole [does not] create[] serious doubt that [the] claimant is, in fact,

18  disabled," the Court declines to exercise "flexibility" and remand for further proceedings.  *Garrison*,

19  750 F.3d at 1021.  The Court sees no basis to seriously doubt that Plaintiff is disabled.

## CONCLUSION

21       For the reasons explained above, Plaintiff's motion for summary judgment is GRANTED and

22  the Commissioner's cross-motion is DENIED. This matter is REMANDED for an award of benefits.

24  Dated: April 29, 2015

_____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE

United States District Court
Northern District of California

37